**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | ) |
| | ) DIVISION ONE |
| Respondent, | ) |
| | ) No. 75031-3-I |
| v. | ) |
| | ) UNPUBLISHED OPINION |
| BOBBY ARLEND NORMAN, | ) |
| | ) |
| Appellant. | ) FILED: June 6, 2016 |
| | ) |

DWYER, J. — Following a jury trial, Bobby Norman was convicted of second degree identity theft and forgery. He now appeals, contending that (1) the court violated his right to counsel, (2) his multiple convictions violate double jeopardy prohibitions, (3) his identity theft conviction was obtained in violation of his right to a unanimous jury verdict, and (4) the identity theft statute is unconstitutionally overbroad, in violation of the First Amendment. We affirm both convictions.

I

On November 4, 2014, Norman entered a Timberland Bank branch and approached a teller. He presented her with a check for $150. The check was drawn on the account of Linda Loeck and showed Norman as the payee. However, the payee line appeared to have been changed and written over with Norman's name.

The check was stolen. Loeck had originally written and mailed it to Capitol One. She did not know who had written Norman's name on the check. Loeck had never met Norman, much less given him permission to use her personal information.

Norman was charged with one count of identity theft in the second degree, pursuant to RCW 9.35.020(3), and one count of forgery, pursuant to RCW 9A.60.020(1)(a)(b). The case proceeded to trial. Because Norman was indigent, he was assigned a court appointed lawyer.

Trial began on May 21, 2015, on a Thursday afternoon. The court held a CrR 3.5 hearing and ruled on numerous pretrial motions, then held jury selection. Once a jury was selected, the court recessed.

Court reconvened on Tuesday morning, following the Memorial Day holiday. When the court inquired whether the parties were ready for the jury to be brought into the courtroom, Norman responded, "Your Honor, I would like to fire my attorney. . . . I don't believe he has my best interest." Norman then elaborated:

> The other day he told me, "Have you ever heard the saying, 'death by gun'? Well, you're doing death by trial." There have been many times that I've tried to contact him and he told me that if I wasn't going to take the deal, don't call him because I'm wasting his time. I'm just fed up with him. I asked him to bring this to the Court's attention and he said that's not my job to do that, it's his job. So I would rather have a different attorney, please.

The court then commenced a colloquy with Norman, during which it addressed this allegation and others of Norman's concerns, including whether: (1) he could have a continuance if he were to represent himself, (2) whether his

prior criminal convictions would be admissible, and (3) whether he would have to take the stand.

The court asked Norman if there was anything he specifically wanted to discuss. During the ensuing conversation, the court learned that Norman's dissatisfaction with his attorney stemmed from Norman's confusion about the admissibility of his prior convictions.

> MR. JORDAN: Your Honor, he wants to talk about ER 609 and what's admissible, and I told him that that was my call and that I knew what was admissible and what wasn't. So I don't know. He thinks he can keep out his entire criminal history and I explained to him that you will decide what part of his criminal history will come in if he testifies, and that's when he said he wanted a new attorney.

Does that pretty much summarize it?

> THE DEFENDANT: Yeah. That was the last straw.

The court then explained to Norman which of his prior convictions could be admitted into evidence, and under what circumstances. At the conclusion of this discussion, Norman indicated that he had no further questions or concerns and was ready for the jury. During the rest of the proceedings, Norman made no further attempt to discharge his attorney.

At the conclusion of the trial, a jury found Norman guilty of both second degree identity theft and forgery.

II

Norman contends that the trial court violated both his right to counsel and his right to self-representation by forcing him to accept representation from a court appointed lawyer against his will. This is so, he asserts, because the court

improperly denied his request to fire his attorney and have new counsel appointed, as well as his request to proceed pro se. We disagree.

The federal and state constitutions guarantee a criminal defendant both the right to counsel and the right to self-representation. U.S. CONST. amends. VI and XIV; WASH. CONST. art. 1, § 22; Faretta v. California, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); State v. Luvene, 127 Wn.2d 690, 698, 903 P.2d 960 (1995). A trial court has discretion to grant or deny both an indigent criminal defendant's request for reappointment of counsel and a request to proceed pro se. See State v. Stenson, 132 Wn.2d 668, 733-34, 940 P.2d 1239 (1997); State v. Modica, 136 Wn. App. 434, 443, 149 P.3d 446 (2006), aff'd, 164 Wn.2d 83, 186 P.3d 1062 (2008). This discretion "lies along a continuum that corresponds with the timeliness of the request[s]," as "[t]he burdens imposed upon the trial court, the jurors, the witnesses, and the integrity of the criminal justice system increase as trial approaches or when trial has already commenced." Modica, 136 Wn. App. at 443. The court possesses the most discretion when a defendant makes these requests after a trial has begun. Modica, 136 Wn. App. at 443-44. A court abuses its discretion if its decision is manifestly unreasonable, relies on unsupported facts, or applies an incorrect legal standard. State v. Coley, 180 Wn.2d 543, 559, 326 P.3d 702 (2014).

A

Norman first challenges the trial court's refusal to appoint him new counsel. A defendant's loss of trust or confidence in his attorney is not alone sufficient to warrant a substitution of counsel. Stenson, 132 Wn.2d at 734.

-4-

Rather, "[a] criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." Stenson, 132 Wn.2d at 734. When a defendant requests new counsel at such a time that a continuance is necessary, courts cannot apply mechanical tests, but must decide to deny or grant such requests based on the circumstances present. State v. Hampton, 184 Wn.2d 656, 669, 361 P.3d 734 (2015).

Herein, Norman did not establish the existence of either an irreconcilable conflict or a complete breakdown in communication between him and his attorney.[1] Following Norman's request that a new attorney be appointed, the court inquired as to his concerns regarding his current attorney. The court learned that Norman's dissatisfaction stemmed from his confusion about the admissibility of his prior convictions. Thereafter, the court explained to Norman which of his convictions were admissible, and under what circumstances they could be admitted. Following this colloquy, Norman made no further requests to discharge the attorney but, instead, indicated that he was ready to proceed to trial. Such an indication suggests that, to the extent that there had previously existed any conflict between Norman and his attorney, it was then resolved.[2] Because Norman did not show good cause to warrant substitution of counsel, the

---

[1] Norman does not assert that there existed a conflict of interest between him and his attorney.

[2] Contrary to Norman's contentions, this was a specific and targeted colloquy when the court twice asked Norman to specifically explain his dissatisfaction with his lawyer and then proceeded to resolve the issue, as well as Norman's other questions and concerns.

trial court did not abuse its discretion when it denied his request for appointment of substitute counsel.

B

Norman next challenges the trial court's refusal to allow him to proceed pro se. The right to self-representation is not self-executing. State v. Woods, 143 Wn.2d 561, 586, 23 P.3d 1046 (2001). Rather, "[a] criminal defendant who desires to waive the right to counsel and proceed pro se must make an affirmative demand." Modica, 136 Wn. App. at 441. Specifically, the request must have been knowing, voluntary, intelligent, *timely*, and *unequivocal*. Woods, 143 Wn.2d at 586; City of Bellevue v. Acrey, 103 Wn.2d 203, 208-09, 691 P.2d 957 (1984). The context in which a self-representation request is made, particularly where it is made in conjunction with a continuance motion, may also be properly considered. See Woods, 143 Wn.2d at 586; Luvene, 127 Wn.2d at 698-99. "[T]he preferred procedure for determining the validity of a waiver involves the trial court's colloquy with the defendant, conducted on the record." Modica, 136 Wn. App. at 441.

Norman's request to proceed pro se was untimely. Norman initially requested to proceed pro se during the colloquy that ensued after he indicated his desire to fire his attorney. This request was made after the trial had commenced, with the jury impaneled and sworn and jeopardy having attached. He then specifically requested a continuance, should he proceed pro se.[3] To have allowed Norman to proceed pro se at this time—and especially to have

---

[3] Norman does not challenge the trial court's denial of his request for a continuance.

granted him a continuance—would have imposed a significant burden on the court, witnesses, and jurors, who were all prepared to begin trial. Thus, his request was untimely.

Furthermore, his request was equivocal. Following the trial court's discussion with Norman regarding the admissibility of his prior convictions, Norman indicated that he was ready for the trial to begin. Indeed, after this discussion, he made no further requests to proceed pro se. His only mention of going pro se was a conditional mention, premised upon obtaining a continuance. He never made an unequivocal request.

Norman's request to proceed pro se was both untimely and equivocal. Thus, the trial court did not abuse its discretion in denying Norman's request. [4]

III

Norman next contends that the trial court violated the prohibition against double jeopardy by entering judgment on his convictions for both second degree identity theft and forgery based on his presentation of a single check. We disagree.

---

[4] Contrary to Norman's contentions, the trial court did not rely on an incorrect legal standard when it denied Norman's request to proceed pro se. The court told Norman: "If you want to represent yourself, then we need to have a discussion about that, what you understand about the law. I can't allow you to do that unless you demonstrate that you understand the law and the Rules of Evidence." While this off the cuff statement was perhaps unartful, the judge's point was to inform Norman that, before he would be permitted to proceed pro se, the court would first have to engage in a colloquy with him to confirm that his request was made intelligently, knowingly, and voluntarily. During this colloquy, the court would have informed Norman that, were he to represent himself, he would be bound by the rules of evidence throughout the course of the trial, just as any attorney would be so bound. The court was thus acting in accord with precedent, which requires a court to "assur[e] that decisions regarding self-representation are made with at least minimal knowledge of what the task entails", including assuring that the defendant is "aware of the existence of technical rules and that presenting a defense is not just a matter of telling one's story." Acrey, 103 Wn.2d at 210-11.

Both the federal and state constitutions prohibit double jeopardy. U.S. CONST. amend. V; WASH. CONST. art. 1, § 9. Within this constraint, the legislature is free to define criminal conduct and specify its punishment. State v. Baldwin, 150 Wn.2d 448, 454, 78 P.3d 1005 (2003); State v. Calle, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). "Where . . . an act or transaction violates more than one criminal statute, the double jeopardy question turns on whether the legislature intended to impose punishment under both statutes for the same act or transaction." Baldwin, 150 Wn.2d at 454.

This presents a question of statutory interpretation, which we review de novo. Cannabis Action Coal. v. City of Kent, 180 Wn. App. 455, 469, 322 P.3d 1246 (2014), aff'd, 183 Wn.2d 219, 351 P.3d 151 (2015). The goal of statutory interpretation is to discern and give effect to legislative intent. Cannabis Action Coal., 180 Wn. App. at 469. "If the statute's meaning is plain on its face, we give effect to that plain meaning as the expression of what was intended." TracFone Wireless, Inc. v. Dep't of Revenue, 170 Wn.2d 273, 281, 242 P.3d 810 (2010).

We first examine whether the language of the relevant statutes expressly allows for convictions under both statutes for the same act or transaction. Calle, 125 Wn.2d at 776. The identity theft statute provides, in pertinent part:

> Every person who, in the commission of identity theft, shall commit any other crime may be punished therefor as well as for the identity theft, and may be prosecuted for each crime separately.

RCW 9.35.020(6).

Thus, it is clear that the legislature sought to allow convictions for multiple offenses where identity theft is one of the offenses. We will follow this legislative

intent so long as proof of the elements of forgery do not also constitute proof of the elements of identity theft. State v. Lynch, 93 Wn. App. 716, 724-26, 970 P.2d 769 (1999). In other words, was it necessary to prove the forgery in order to prove the identity theft? If it was not, the anti-merger statute controls our analysis.[5]

To prove identity theft, the State presented evidence that Norman transferred Loeck's check—which contained a means of identifying Loeck—to Timberland Bank. This evidence does not support the forgery charge. In contrast, to prove forgery, the State presented evidence that Norman had written in his name as the payee on the check. Likewise, this evidence does not support the identity theft charge. That the crimes had different victims—Loeck was the victim of identity theft, while Timberland Bank was the victim of the forgery—further supports a finding that it was not necessary for the prosecution to establish the elements of the forgery charge in order to establish the elements of the identity theft charge. Thus, the anti-merger statute controls our analysis, see State v. Timothy K., 107 Wn. App. 784, 790-92, 27 P.3d 1263 (2001), and Norman's claim of error fails.[6]

IV

Norman additionally contends that his second degree identity theft conviction violated his right to a unanimous jury verdict. This is so, he asserts,

---

[5] The legislature clearly envisioned prosecutions alleging both identity theft and forgery. In the forgery statute, it commands, "[i]n a proceeding under this section that is related to an identity theft under RCW 9.35.020, the crime will be considered to have been committed in any locality where the person whose means of identification or financial information was appropriated resides." RCW 9A.60.020(2).

[6] This holding is in accord with the Supreme Court's decision in State v. Baldwin, 150 Wn.2d 448.

because, as set forth in RCW 9.35.020, identity theft is an alternative means crime and the State failed to present sufficient evidence of each alternative means. We disagree.

Norman's claim presents a question of statutory interpretation. As stated previously, we review questions of statutory interpretation de novo. Cannabis Action Coal., 180 Wn. App. at 469.

The pertinent statute provides: "No person may knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime." RCW 9.35.020(1).

While each statute must be individually analyzed, our Supreme Court has established some principles to guide a determination of whether a criminal statute sets forth alternative means of committing a crime.

> One guiding principle is that the use of a disjunctive "or" in a list of methods of committing the crime does not necessarily create alternative means of committing the crime. State v. Peterson, 168 Wn.2d 763, 769, 770, 230 P.3d 588 (2010). Another principle provides that the alternative means doctrine does not apply to mere definitional instructions; a statutory definition does not create a "means within a means." State v. Smith, 159 Wn.2d 778, 787, 154 P.3d 873 (2007).

State v. Owens, 180 Wn.2d 90, 96, 323 P.3d 1030 (2014).

Our Supreme Court's analysis in Owens is instructive in this case. Therein, the court considered whether trafficking in stolen property is an alternative means crime. The pertinent statute provided: "A person who knowingly initiates, organizes, plans, finances, directs, manages, or supervises the theft of property for sale to others, or who knowingly traffics in stolen

property, is guilty of trafficking in stolen property in the first degree." RCW 9A.82.050(1).

The defendant in Owens argued, much as Norman argues here, that the verbs listed in the statute supported the conclusion that the legislature had set forth eight alternative means of committing first degree trafficking in stolen property. See Owens, 180 Wn.2d at 95-99. The Supreme Court rejected this interpretation. Owens, 180 Wn.2d at 98-99. It concluded instead that the statute created only two alternative means. Owens, 180 Wn.2d at 98-99.

In determining that each listed verb did not constitute an alternative means, the court explained:

> [I]t would be hard to imagine a single act of stealing whereby a person "organizes" the theft but does not "plan" it. Likewise, it would be difficult to imagine a situation whereby a person "directs" the theft but does not "manage" it. Any one act of stealing often involves more than one of these terms. Thus, these terms are merely different ways of committing one act, specifically stealing. . . . [A]n individual's conduct under [this statute] does not vary significantly between the seven terms listed.

Owens, 180 Wn.2d at 99. Stated differently, the verbs listed were so closely related that they did not address distinct acts. Instead, these verbs all defined variations of the same act.

The language of the identity theft statute at issue herein is, in relevant respects, similar to that of the statute interpreted in Owens. As in Owens, the disjunctive list of acts contained within this statute describes a continuum of related activity, rather than various distinct acts. For example, it is difficult to imagine a situation whereby a person transfers a means of identification, but

does not first possess it. Thus, the identity theft statute sets forth only one—not four—means of committing the crime.

Because identity theft is not an alternative means crime, Norman's second degree identity theft conviction was not obtained in violation of his right to a unanimous jury verdict. There was no error.

V

Norman next contends that RCW 9.35.020 violates the First Amendment of the United States Constitution. This is so, he asserts, because it is so overbroad that it prohibits constitutionally protected expression. We disagree.

"A law is overbroad if it sweeps within its prohibitions constitutionally protected free speech activities." City of Tacoma v. Luvene, 118 Wn.2d 826, 839, 827 P.2d 1374 (1992). Speech integral to criminal conduct is not constitutionally protected, United States v. Stevens, 559 U.S. 460, 468, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010), nor is untruthful speech protected for its own sake. Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976).

An ordinance that regulates behavior, but not pure speech, will not be overturned unless the overbreadth is real and substantial in relation to the ordinance's plainly legitimate sweep. City of Tacoma, 118 Wn.2d at 839-40. Indeed, "[a]lthough it is possible to conceive of circumstances in which application of [a] statute would be unreasonable, that alone will not render it unconstitutional. Unless there is a *realistic danger* that [a] statute will significantly compromise recognized First Amendment protections of parties not

-12-

before the court, [it will not be] declare[d] . . . facially invalid on overbreadth grounds." State v. Stephenson, 89 Wn. App. 794, 804, 950 P.2d 38 (1998) (emphasis added) (citation omitted) (citing Members of City Council v. Taxpayers, 466 U.S. 789, 801, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984)); see also State v. Knowles, 91 Wn. App. 367, 380, 957 P.2d 797 (1998).

In deference to the legislature's constitutional role as the definer of crimes, we interpret statutes with the presumption that they are constitutional. State v. Pauling, 149 Wn.2d 381, 386, 69 P.3d 331 (2003).

RCW 9.35.020 states that "[n]o person may knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime." This statute specifically regulates behavior, as evidenced in the legislative purpose. "The legislature intends to penalize for each unlawful act of improperly obtaining, possessing, using, or transferring means of identification or financial information of an individual person." RCW 9.35.001. The statute by its terms prohibits such conduct only when committed with the requisite mens rea—intent to commit a crime—as defined therein. Contrary to Norman's arguments, this language does not create thought crimes. An individual cannot violate the statute unless he or she both possesses the requisite mens rea and commits the proscribed violative action.

Because an individual violates the identity theft statute only under these conditions, it is not overbroad. Indeed, there is no *real* danger that the statute will compromise the expression of constitutionally protected behavior. The only

-13-

"speech" truly proscribed here is that which is untruthful and integral to criminal conduct, which the First Amendment does not protect. Thus, the identity theft statute is not overbroad. It does not violate the First Amendment.

Affirmed.[7]

We concur:

---